IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JEREMY R. SHEETS,

    Defendant.

Case No. 1:10-cr-00380-PLM

Hon. Paul L. Maloney

---

| | |
|---|---|
| Jason C. Turner<br>U.S. Department of Justice, Antitrust Division<br>209 S LaSalle Street, Suite 600<br>Chicago, IL 60604<br>(312) 353-7530<br>Attorneys for Plaintiff<br>Email: jason.turner@usdoj.gov | Martin E. Crandall (P26824)<br>Clark Hill PLC<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>(313) 965-8300<br>Attorneys for Jeremy R. Sheets<br>mcrandall@clarkhill.com |

---

### DEFENDANT JEREMY R. SHEETS' SENTENCING MEMORANDUM

Defendant, Jeremy R. Sheets ("Mr. Sheets"), by his counsel, Martin E. Crandall, submits this Sentencing Memorandum regarding his sentencing scheduled for June 6, 2011, at 3:30 p.m.

Pursuant to 18 U.S.C. § 3553, the sentencing court, in determining the particular sentence to impose, shall consider:

> (1) The nature and circumstances of the offense and the history and character of the defendant; (2) the need for the sentence imposed, (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission …; (5) any pertinent policy statement … ; (6) the

> need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *United States v. Booker*, 543 U.S. 220; 125 S. Ct. 738 (2005), the United States Supreme Court held that the ranges contained in the sentencing guidelines are advisory, and that courts may tailor individual sentences to reflect other considerations, even when the resulting sentence falls outside the range recommended by the guidelines. Moreover, in *Gall v. United States,* 552 U.S. 38; 128 S. Ct. 586 (2007), the United States Supreme Court set forth the procedures a sentencing court should follow in determining an appropriate individualized sentence. Under this procedure, the trial court should not automatically presume that a sentence that falls within the guidelines is reasonable, because such a presumption would defeat the goals of individualized sentencing. *Id.* at 50. Rather, the guidelines are but one of many factors for the sentencing court to consider. *Id.* As the Sixth Circuit has recognized, "*Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir.), *cert. denied*, 129 S. Ct. 68; 172 L. Ed. 2d 26 (2008).

On September 30, 2011, Mr. Sheets entered into a Rule 11 Plea Agreement whereby he agreed to plead guilty to one count of defrauding the federal E-Rate Program in violation of Title 18, United States Code, Section 1343, the crime of wire fraud. Pursuant to the Plea Agreement, on January 24, 2011, Mr. Sheets pled guilty to one count of wire fraud. The Court deferred acceptance of the plea on that date, but the plea was ultimately approved and adopted by Court order on February 8, 2011.

Sentences must be tailored to the circumstances of each case, and in this instance, a review of the 18 U.S.C. § 3553(a) factors outlined above demonstrates that Mr. Sheets is deserving of downward departure from the sentencing guidelines.

First, pursuant to 18 U.S.C. § 3553(a)(1), the sentencing court should consider the nature and circumstances of the offense. Importantly, the nature and circumstances of the offense should be considered in their entirety and in the proper context. In this case, the Presentence Report, specifically Part A, The Offense, Charge(s) and Conviction(s) (herein referred to as "Presentence Report Charge") although factually correct, overstates certain facts and further omits critical additional facts. The result is that the true nature and circumstances of Mr. Sheets' offense is jeopardized, because the Presentence Report Charge reads as though Mr. Sheets, since early 2000, individually and unilaterally set out with planned, schemed, or designed criminal intent to defraud the federal E-Rate Program. This simply is not an accurate reflection of this case.

Although Mr. Sheets takes full responsibility for his actions and has already admitted scienter beginning in 2007, it must be highlighted that for many years prior to 2007, Mr. Sheets was unaware that his actions, although knowingly unethical, in fact violated federal law and would result in his current charge. Additionally, as will be more fully set forth below, the Presentence Report Charge is void of any indication that, when Mr. Sheets first realized he was in fact illegally defrauding the federal government, the driving and motivating force behind his fraudulent actions was fear and panic, rather than planned, schemed, or designed criminal intent. Mr. Sheets has admitted scienter; however, his admitted fraudulent actions were reactive. He was desperately trying to gain control over a situation that had become catastrophic to his

7008811.1 22005/120392

business, his business relationships, and his personal life. This is a critical distinction that is properly considered under 18 U.S.C. § 3553(a).

To substantively explain this critical distinction and put the nature and circumstances of Mr. Sheets' offense in the proper context, the following important facts must be considered.

To begin with, when CMS-Internet, LLC ("CMS") first began to provide internet services to school districts through the federal E-Rate Program in December 2001, the school districts CMS provided services to were already familiar with the E-Rate Program, because they had already participated in the E-Rate Program with their previous internet service providers. To at least some extent, the school districts had already established their own E-Rate Program compliance protocol before Mr. Sheets or CMS became involved.[1] Importantly, CMS's provision of internet services under the E-Rate Program was initiated by the school districts approaching CMS. Additionally, outside of and prior to CMS's participation in the E-Rate program, CMS provided consulting and hardware sales to the school districts. In light of the true relationship between Mr. Sheets, CMS, and the school districts, Mr. Sheets was simply not in a position to individually or unilaterally structure or control participation in the E-Rate Program.[2]

Relatedly, the decisions surrounding the misrepresentations that became the subject of this charge were also not made individually or unilaterally by Mr. Sheets with planned, schemed, or designed criminal intent. Instead, at the time of their making, these were business decisions,

---

[1] Federal investigations were conducted regarding the legality of the school districts' participation in the E-Rate Program with CMS's predecessor.

[2] CMS did not have to complete a qualification process before being allowed to participate in the E-Rate Program, and CMS had no part in the school districts' application to the E-Rate program for eligibility. Under the E-Rate Program, the school district files FCC Form 471, whereby the applicant school, and not the service provider, certified that it was requesting funding for eligible services, followed procurement rules, and had the money to pay for its share of the services. Mr. Sheets bid for service contracts with the schools, but the school districts ultimately approved him and certified the contracts' authenticity to the government. The application process demonstrates that Mr. Sheets would have been unable to unilaterally act under the E-Rate Program; the school districts had substantial involvement. Mr. Sheets did receive documents explaining the rules and regulations of the program at the time CMS became a provider, and he also understood that CMS's services would be compensated in whole or in part by the program; however, Mr. Sheets was not aware of all of the rules and regulations of the program when CMS began providing services to the school districts.

4

designed to provide the school districts better service at a lower cost, while generating business opportunity for CMS. The ideas to "lease" the towers, make "donations" to the schools[3], provide "ineligible" goods and services[4], and utilize the "slush fund" were created by and discussed between Mr. Sheets and the school districts. Mr. Sheets ultimately agreed to each of these ideas; however, it is inaccurate to state that he came up with them at the time for the specific purpose of defrauding the government. Although Mr. Sheets' takes full responsibility for ultimately implementing these later-realized illegal actions, the motivation behind their initial creation was simply not planned, schemed, or designed criminal intent.

Finally, prior to Mr. Sheets destroying any documentation on his own, advising any person to destroy documentation, or advising any person to testify falsely before a grand jury, Mr. Sheets was contacted by a school district official who advised him that the school district was being investigated for violating the E-Rate Program through its contracts with its previous internet provider and instructed him to delete all correspondence from the school district official which Mr. Sheets had on his computer system. Importantly, out of fear, Mr. Sheets complied with this request prior to any subpoenas being issued in this case. Subsequent to complying with the school district official's request, Mr. Sheets received the subpoena in this case. Upon receiving this subpoena, Mr. Sheets panicked, because he knew that he had already destroyed documents responsive to the subpoena. Once in panic mode, Mr. Sheets began his attempt to backpedal out of a now known disastrous situation. As part of that attempt, he advised others to

---

[3] At the time Mr. Sheets made the donations, he did not know that this conduct was not allowed under the E-Rate program's federal regulations. He simply believed he was making a donation to the school districts in the same manner that any other entity or person would be able to do.

[4] When CMS realized it could provide internet services at a cheaper cost to the school districts than originally thought, CMS approached the school district to discuss the lower rate. The school district responded that, rather than receive the reduced charge, it would rather CMS use the excess money to supply additional equipment to the school to enhance the school's technology. CMS agreed, and provided the school district with a variety of technology, computers, servers, and upgrades to its network infrastructure, which were not in fact eligible for reimbursement. Although Mr. Sheets realized that this seemed unethical and was initially reluctant to agree, because the school district was a good customer and CMS was a small company, he ultimately did agree.

destroy documents. He did so because, in addition to fearing for himself, he also feared for CMS's business and others who communicated to him fear for their own jobs and families. Realizing that the effects of his earlier decisions seriously threaten CMS and other persons, Mr. Sheets attempted to ensure that others, such as Mr. Sisson, would avoid burden and liability. This is when, while being hard-pressed for advise on how to respond to potential grand jury questioning, Mr. Sheets advised Mr. Sisson to lie to the grand jury. The primary motivation behind this instruction was to limit the burden on Mr. Sisson; it was not motivated by an attempt by Mr. Sheets to obstruct justice or hide from his own liability. Mr. Sheets' actions were knowingly illegal, but the motivation behind these actions, while unethical, was not planned, schemed, or designed criminal intent to defraud the federal government.

In sum, when the nature and circumstances of Mr. Sheets' offense are considered in total, the true extent of Mr. Sheets' "criminal intent" is realized. Mr. Sheets has in fact admitted scienter, but he has done so in a more limited application than the Presentence Report Charge reflects. Mr. Sheets knowingly acted illegal out of fear and panic, and not planned, schemed, or designed criminal intent. For this reason, Mr. Sheets is deserving of downward departure from the sentencing guidelines.

Moreover, also pursuant to 18 U.S.C. § 3553(a)(1), the sentencing court should consider the history and character of Mr. Sheets. Mr. Sheets' demonstrated good character reveals that he is entitled to downward departure in this case.

First and foremost, Mr. Sheets has no criminal history or history of drug or alcohol abuse; rather, he is an irreplaceable asset to his business, community, and family. (See character letter from Timothy Bohen, attached as Exhibit A). Mr. Sheets is the President and part owner of CMS; he has been with CMS for eleven years. Since 2004, Mr. Sheets has managed CMS's Mt.

Pleasant office, where he supervises approximately twelve employees (2/3 CMS's total employees). For eleven years, Mr. Sheets has worked honestly and diligently to make CMS a profitable and well-respected business. He has been successful in creating and maintaining CMS's positive reputation. Mr. Sheets truly is a hardworking and innovative business man. He, along with CMS, is known for quality work, customer satisfaction, and a unique ability to problem solve for the benefit of all involved when faced with adversity. (See character letters demonstrating Mr. Sheets' business reputation, attached as Exhibits B-M).

Additionally, Mr. Sheets is a honest and considerate citizen in both his business and individual capacity. (See character letters demonstrating Mr. Sheets' personal and community reputation, attached as Exhibits N-Y). Mr. Sheets has made it a habit to support his community; he has contributed time, funds, and communication services to many organizations in need of such support. (See list of Mr. Sheets' Charitable Contributions and Service Donations, attached as Exhibit Z). Prior to his conviction, Mr. Sheets served on both the Central Michigan Community Hospital Foundation Board and the Union Township Economic Development Board. He sincerely is dedicated to bettering the community he lives and works in for all persons.

Finally, Mr. Sheets is integral to his young family. (See letter from wife Laura Sheets, attached as Exhibit AA). Mr. Sheets married his current wife, Laura, in 2009. Laura has two small children, currently ages 6 and 4, from a previous marriage. These young children live with her and Mr. Sheets full time. Mr. Sheets acts as a father-figure to the children because the children's biological father is not very involved in their lives. Mrs. Sheets and the children depend on Mr. Sheets' love and child-raising assistance. Additionally, Mr. Sheets and his wife welcomed their first child together, a boy, into their family on May 24, 2011. Mrs. Sheets

undoubtedly needs the support of her husband to care for her and their new baby, and all the children need the support of their father-figure.

In sum, when the history and character of Mr. Sheets is considered, his demonstrated good character in his business, community, and family becomes evident. For this additional reason, Mr. Sheets is deserving of downward departure from the sentencing guidelines.

Furthermore, pursuant to 18 U.S.C. § 3553(a)(2), the sentencing court should consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. A consideration of these factors further demonstrates that Mr. Sheets is deserving of downward departure in this case.

First, Mr. Sheets has accepted full responsibility for his actions; he timely pled guilty to his charged offense. In doing so, he demonstrated that he understands the seriousness of his actions and respects the law that holds him accountable for them. Additionally, Mr. Sheets has already suffered significant punishment. His business and personal reputation have forever changed. His company, CMS, has paid significant restitution to the government. It has foregone E-Rate Program funding applications worth over $250,000, lost current business, and will likely continue to suffer business losses into the future. Personally, Mr. Sheets has paid $115,534 in restitution to the USAC. He has had to resign from his two board member positions. He has had his personal and business integrity questioned. In light of the significant punishment Mr. Sheets has already endured, further punishment would not have any additional significant deterrent effect. The lost business opportunities, financial penalties, and negative reputation changes

7008811.1 22005/120392

provide adequate general deterrence to society at large. They also provided ample specific deterrence to Mr. Sheets, as reflected by Mr. Sheets' full acceptance of responsibility and restitution payment. Mr. Sheets has learned his lesson; he poses no threat to the public's safety. Individually and in combination, these are additional reasons that Mr. Sheets is deserving of downward departure in this case.

Finally, pursuant to 18 U.S.C. § 3553(a)(7), the sentencing court should consider the need to provide restitution to any victims of the offense. As set forth above, Mr. Sheets paid restitution in the amount of $115,534.00 on February 2, 2011, to the USAC and CMS has foregone E-Rate Program funding applications. Mr. Sheets will pay additional restitution as the sentencing court deems fit. There are no other victims in this case.

In sum, based on a consideration of (1) a complete review of the nature and circumstances of Mr. Sheets' offense, (2) Mr. Sheets' demonstrable good character and full acceptance of responsibility, (3) the punishment and resulting deterrence Mr. Sheets has already endured, and (4) Mr. Sheets' restitution payment to his victim and CMS's foregone E-Rate Program funding applications, Mr. Sheets respectfully requests this court to grant a downward departure from the sentencing guidelines, most importantly, so that he can provide much needed emotional, financial, and other support to his young and growing family.

Respectfully submitted,

CLARK HILL PLC

By: /s/ Martin E. Crandall
    Martin E. Crandall (P26824)
500 Woodward Avenue, Suite 3500
Detroit, MI 48226-3435
(313) 965-8300
Attorneys for Jeremy Sheets
mcrandall@clarkhill.com

Dated: June 27, 2011

7008811.1 22005/120392

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2011, my assistant electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

I also hereby certify that on June 27, 2011, my assistant mailed and emailed the foregoing paper to Lori A. Hodel, A. Hodel, U.S. Probation Officer, 101 Federal Building, 110 Michigan Avenue, N.W., Grand Rapids, MI 49503 - Lori_Hodel@miwp.uscourts.gov.

/s/ Martin E. Crandall
Martin E. Crandall (P26824)
500 Woodward Avenue, Suite 3500
Detroit, MI 48226-3435
(313) 965-8300
Attorneys for Jeremy Sheets
mcrandall@clarkhill.com

7008811.1 22005/120392